IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

CHARLIE L. SWAIN,               )        CASE NO. 3:17CV01405
                                )
              Plaintiff,        )        JUDGE JEFFREY J. HELMICK
                                )
        v.                      )        MAGISTRATE JUDGE
                                )        JONATHAN D. GREENBERG
NANCY A. BERRYHILL,             )
      Acting Commissioner       )
      of Social Security,       )
                                )        **REPORT AND**
              Defendant.        )        **RECOMMENDATION**

Plaintiff, Charlie L. Swain, ("Plaintiff" or "Swain"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends the

Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In October 2013, Swain filed applications for POD, DIB, and SSI, alleging a disability

_____

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

onset date of December 31, 2008, and claiming she was disabled due to migraine headaches, high blood pressure, short and long term memory loss, anxiety, a cardiac condition, and poor reading comprehension.  (Transcript ("Tr.") 186, 200, 215.)  The applications were denied initially and upon reconsideration, and Swain requested a hearing before an administrative law judge ("ALJ"). (Tr. 107, 115, 120.)

On June 24, 2016, an ALJ held a hearing, during which Swain, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 45-76.)  On September 28, 2016, the ALJ issued a written decision finding Swain was not disabled.  (Tr. 18-40.)  The ALJ's decision became final on May 23, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On July 3, 2017, Swain filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13 & 14.) Swain  asserts the following assignment of error:

> (1) The ALJ has erred in weighing the opinion evidence in regard to Ms. Swain's mental health impairment.  She has erred in evaluating and assigning weight to the opinions of Dr. Pawloski, Dr. Clark, Counselor Brown, Dr. Tishler, and Dr. Haskins.  In so-doing she has committed legal error as well as failed to rely on substantial evidence.  Her severity finding and her RFC finding thus fail to rely on substantial evidence.

(Doc. No. 13.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Swain was born in April 1956 and was 60 years-old at the time of her administrative hearing, making her a "person closely approaching retirement age" under social security regulations.  (Tr. 77.)  *See* 20 C.F.R. §§ 404.1563(e) & 416.963(e).  She has a limited education and is able to communicate in English.  (Tr. 89.)  She has past relevant work as a stock clerk,

2

cleaner, cashier, assembler, and inspector.  (Tr. 39.)

**B.      Medical Evidence**

At the outset, the Court notes the parties do not direct this Court's attention to any medical records dating between Swain's December 31, 2008 alleged onset date and April 2, 2013.[2]

On April 2, 2013, Swain was hospitalized due to complaints of chest pain, dizziness, and headaches.  (Tr. 357.)  She underwent a full cardiac workup, which was largely negative.  (*Id*.) She had a brain CT scan, which was negative for any acute intracranial process.  (Tr. 358.) Swain was discharged the next day, with diagnoses of chest pain, uncontrolled hypertension, coronary artery disease, a history of cerebral aneurysm, gastrointestinal reflux disease ("GERD"), hiatal hernia, and depression and anxiety, by history.  (*Id*.)

Swain underwent an updated brain CT scan on October 1, 2013, and it again revealed no acute intracranial abnormality.  (Tr. 304.)  It did indicate linear low attenuation in the region of the right basal ganglia/external capsule.  (*Id*.)

On January 15, 2014, Swain presented to the emergency room, reporting she had attempted suicide by intentionally taking a large quantity of medications.  (Tr. 309.)  She promptly vomited these medications and her urine drug screen was negative.  (Tr. 309, 310.)

---

[2]      The Court further notes its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the Parties' Briefs.  Moreover, both Swain and the Commissioner have cited to evidence relating to Swain's physical impairments.  Because Swain's assignments of error deal exclusively with her mental impairments, the Court will not include a review of this evidence in its decision.  This evidence reveals Swain, in addition to her mental complaints, has a cardiac condition, dizzy spells, hypertension, and left leg and shoulder issues.

Swain was admitted to the intensive care unit for observation. (Tr. 310.) During her admission, she described an increasingly stressful past six months. (Tr. 311.) The hospital physicians concluded she likely did not digest any of the medications she attempted to overdose on. (Tr. 311.) During her admission, she did see a counselor, Megan Chitwood, LPC, for a crisis intervention assessment. (Tr. 400.) Ms. Chitwood noted Swain had a logical, clear thought process and had "changed her mind" about suicide. (Tr. 401.) As Swain no longer met the criteria for hospitalization, she was discharged on January 16, 2014. (Tr. 402, 313.)

Following this brief hospital stay, Swain underwent an adult diagnostic assessment with counselor Tim Brown, LPCC-S, on January 22, 2014. (Tr. 480.) She reported she was currently living with a friend and described a history of domestic violence. (*Id.*) She indicated she was recently fired from Wal-Mart. (Tr. 481.) She reported she had held a wide variety of jobs, but was unable to maintain employment due to being "slow." (*Id.*) She attributed this slowness to a remote brain injury. (*Id.*) Swain also described a history of drug and alcohol abuse, but indicated 30 years of sobriety. (Tr. 483.) Swain described trouble focusing and occasional suicidal ideation. (Tr. 484, 486.) She reported she was currently taking Celexa from her primary care doctor, but did not find it helpful. (Tr. 486.)

During the assessment, Mr. Brown noted Swain had average eye contact and a logical thought process. (Tr. 489.) Mr. Brown diagnosed Major Depressive Disorder, recurrent, moderate; Polysubstance Dependance in full sustained remission; and Personality Disorder. (Tr. 486.) He assessed a Global Assessment of Functioning[3] ("GAF") score of 54. (Tr. 487.)

---

[3]     The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 51 and 60 indicates

Swain returned to Mr. Brown for counseling on January 29, 2014.  (Tr. 496.)  She relayed her life was "crappy" and described conflict with her daughter.  (*Id*.)  She denied any suicidal ideation.  (*Id*.)

On February 10, 2014, Swain visited primary care doctor James Heddleson, D.O., for treatment of a lung nodule and chronic cough.  (Tr. 474.)  She indicated she had a brain aneurysm surgery in 1995 and had complications following this procedure.  (*Id*.)  Dr. Heddleson noted a negative mental health history and prescribed Celexa.  (Tr. 475.)

Swain visited primary care doctor Mark Piacentini, M.D., on April 15, 2014.  (Tr. 567.)  On examination, Swain's memory was intact.  (*Id*.)  However, Swain described some memory loss from her antidepressant, so Dr. Piacentini adjusted her dosage.  (Tr. 568.)

On April 17, 2014, Swain returned to Mr. Brown for counseling.  (Tr. 494.)  She reported a tumultuous living situation over the past few months, but indicated she was now in an income-based apartment.  (*Id.*)  She reported sadness and diminished energy, but denied suicidal ideation.  (*Id.*)  Swain saw Mr. Brown again on May 1, 2014, reporting financial stressors.  (Tr. 492.)  However, she denied suicidal ideation and Mr. Brown noted she was "upbeat" despite her circumstances.  (*Id.*)

On May 12, 2014, Swain visited Dr. Heddleson, reporting daytime sleepiness.  (Tr. 477.)  Dr. Heddleson told her to avoid sleeping on her back.  (Tr. 479.)  He also listed "anxiety

---

moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

disorder" as a diagnosis.  (*Id.*)

Swain's final counseling visit with Mr. Brown was on May 16, 2014.  (Tr. 490.)  She described financial stress, but indicated she was doing better, as her life was almost "back to normal."  (*Id.*)

Swain continued to receive an antidepressant from Drs. Heddleson and Piancentini.  (Tr. 505, 563.)  On December 10, 2014, Dr. Piancentini noted Swain did not have any apparent "psychological or social disorders."  (Tr. 563.)  On March 25, 2015, Swain reported dizziness, but had no obvious neurological deficits on examination.  (Tr. 560.)  Dr. Piancentini noted Swain's insight and judgment were good and her mood and affect were normal.  (*Id.*)  He again found she had no apparent "psychological or social disorders."  (Tr. 561.)  He prescribed her a medication for her dizzy spells and provided her with a slip indicating was "unable to work." (*Id.*)

On June 3, 2015, Swain visited Dr. Piancentini for leg pain and falls.  (Tr. 558, 559.)  Her mood, affect, judgment, and insight were all normal.  (Tr. 558.)  Dr. Piancentini recommended she see a neurologist.  (Tr. 559.)  Swain returned to Dr. Piancentini on July 22, 2015 for a thumb cyst, right leg pain, and dizziness.  (Tr. 556.)  Her insight, judgment, mood, and affect continued to be normal.  (Tr. 557.)  Dr. Piancentini noted Swain had no apparent "psychological or social disorders," though he continued to prescribe Celexa.  (Tr. 556, 557.)

On February 3, 2016, Swain was hospitalized for chest pain.  (Tr. 584.)  Upon admission, the hospital physicians noted her history of depression and Celexa prescription.  (Tr. 585.)  Following this hospitalization, Swain followed up with Dr. Piancentini on February 10, 2016. (Tr. 554.)  Dr. Piancentini noted good insight and judgment.  (Tr. 555.)

Swain visited cardiologist Gregory Charles Heins, D.O., on March 8, 2016.  (Tr. 639.)

Dr. Heins concluded Swain was stable from a cardiac standpoint.  (*Id*.)  Swain indicated she

believed some of her cardiac symptoms were due to stress.  (*Id*.)

On April 6, 2016, Swain visited Dr. Piancentini, reporting she needed a slip stating she

could not work due to anxiety, balance, and dizziness.  (Tr. 552.)  Dr. Piancentini noted good

insight and judgment and a normal mood and affect.  (*Id*.)  He indicated no apparent

"psychological or social disorders."  (*Id*.)

On July 28, 2016, Swain underwent a neuropsychological evaluation with J.R. Clark, Jr.,

Psy.D.  (Tr. 652.)  She reported migraine headaches, a remote history of cerebral aneurysm

surgery, depression, and cognitive problems.  (*Id*.)  She described dizzy spells, repeated falls, and

hearing loss.  (*Id*.)  Swain also reported short term memory deficits, confusion, poor sleep, and

poor reading comprehension.  (Tr. 653.)  She indicated she was depressed and anxious from

financial stress.  (*Id*.)  She denied any current suicidal ideation.  (*Id*.)  Swain also described a

difficult life and history of abuse.  (Tr. 654.)

Dr. Clark administered a battery of tests on Swain.  (*Id*.)  Her verbal comprehension was

average, her perceptual reasoning was high average, her working memory was average, and her

processing speed was below to low average.  (Tr. 656.)  Her single word reading skills were

average to high average and her math calculation skills were average.  (*Id*.)  Swain completed a

Beck Depression Inventory II during the evaluation and received a score within the range of

severe depression.  (Tr. 657.)

Based upon this evaluation, Dr. Clark diagnosed Major Depressive Disorder, recurrent,

moderate severity; Post-traumatic Stress Disorder, chronic; Substance Use Disorder, in sustained

7

full remission; rule out Unspecified Sleep-Wake Disorder; and rule out Unspecified Somatic Symptom and Related Disorder.  (Tr. 658.)  Dr. Clark noted the results of Swain's "neuropsychological testing were nearly uniformly normal."  Specifically, Dr. Clark found Swain's "verbal and visual attention spans, immediate and delayed memory for verbal and visual material, language skills, fine motor dexterity, visual perceptual and spatial processing skills, and cognitive executive skills involving working memory and mental flexibility were all uniformly intact. Based on evaluation results there is no evidence to suggest the presence of a neurodegenerative process."  (*Id*.)  Dr. Clark concluded Swain's subjective reports of poor short-term memory and disorientation were "likely attributable to non-neurological factors."  (Tr. 659.) He recommended she obtain counseling and an overnight sleep study.  (*Id*.)

Dr. Clark opined "I support the patient obtaining Social Security benefits (SSI) given the extent and severity of her psychological difficulties with accompanying compromise in day-to-day functioning.  I do not believe the patient is capable of engaging in full-time gainful employment at this time."  (*Id*.)

On August 24, 2016, Swain underwent an otoneurology consultation with Charles Andrew Sales, M.D.  (Tr. 661.)  She described vertigo, poor memory, depression, imbalance, hearing loss, and migraines.  (Tr. 662.)  On examination, her speech was normal and her "attention, memory, and fund of knowledge were normal in conversation."  (Tr. 664.)  She did have an unsteady gait and leaned on her service dog when walking.  (*Id*.)  She had signs of otolith loss on examination, which Dr. Sales determined were possibly causing her dizziness. (Tr. 661.)  Dr. Sales concluded Swain's headaches were cervicogenic in etiology.  (*Id*.)  He noted she had "significant anxiety/depression due to social events in her life."  (*Id*.)  Based on

8

this examination, Dr. Sales recommended vestibular rehabilitation and felt Swain could "defer psych rehab for now." (*Id.*)

**C.      State Agency Reports**

**1.      Mental Impairments**

On January 27, 2014 consultative examiner Brithany H. Pawloski, Psy.D., conducted a psychological examination of Swain.  (Tr. 467-472.)  Swain reported problems with her thought processes, memory, poor sleep, and low mood.  (Tr. 468, 470.)  She described a remote history of drug abuse.  (Tr. 469.)  She reported a variety of jobs, but denied any significant difficulties in completing her job tasks.  (*Id.*)  Swain reported she was on an antidepressant, which she found ineffective.  (*Id.*)  During the evaluation, Dr. Pawloski noted Swain was "tense and hurt," but her thought processes were well organized and logical.  (Tr. 470.)  She did not present with any signs of excessive anxiety.  (*Id.*)  Dr. Pawloski tested Swain's memory, and found no deficits in recent, remote, or immediate memory.  (*Id.*)  She estimated Swain's intelligence to be in the average range.  (*Id.*)

Based upon this evaluation, Dr. Pawloski diagnosed Major Depressive Disorder, single episode, moderate and assessed a GAF score of 58.  (Tr. 471.)  She noted prior to 2013, Swain had "no significant history of mental health issues."  (*Id.*)  She found Swain did not "present with any significant deficits in memory or cognitive abilities."  (*Id.*)  Dr. Pawloski provided the following opinion regarding Swain:

> **Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions:** The claimant reports poor grades in high school and leaving school after the tenth grade.  Her presentation on interview supports that she may have difficulties with arithmetic, but in general does not have any major deficits in understanding, remembering, or carrying out instructions.  She is most likely to learn best

9

through verbal instructions instead of reading.

> **Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multistep tasks:** The claimant tended to have a low frustration tolerance for tasks.  This appears to be her biggest barrier and will impact her persistence and pace fairly significantly related to her mood.  In general, she does not appear to have any significant deficits in attention or concentration.

> **Describe the claimant's abilities and limitations in responding appropriately to supervisors and coworkers in the work setting:** The claimant presents with a fairly blunt and curt presentation.  In general, she is not the most pleasant person, but she appears to be able to interact within appropriate means.  Any deficits she is experiencing appear [to] be variable depending on her working environment.

> **Describe the claimant's abilities and limitations in responding appropriately to work pressure in a work setting:** The claimant does not report any emotional or mental deterioration in response to work exposure.  It appears that losing her job and losing her house has caused the greatest amount of psychological distress.  In general, it is not anticipated that work exposure would create any deterioration in her mental health due to the fact that she appears motivated to not feel "lazy."

(Tr. 472.)

On February 8, 2014, state agency physician Carl Tishler, Ph.D., reviewed Swain's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 82-83.)  He concluded Swain had (1) mild restrictions in activities of daily living; (2) moderate difficulties in social functioning; (3) moderate difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation.  (Tr. 82.)  Dr. Tishler also filled out a Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 86-88.)  He found Swain was moderately limited in her abilities to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or in proximity to others without being distracted by them; (4) complete a normal workday and workweek without

10

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) accept instructions and respond appropriately to criticism from supervisors; and (6) respond appropriately to changes in the work setting.  (*Id*.)  He found Swain was not significantly limited in her abilities to (1) remember locations and work-like procedures; (2) understand, remember, and carry out very short and simple instructions; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) make simple work-related decisions; (6) interact appropriately with the general public; (7) ask simple questions or request assistance; (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (9) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (10) be aware of normal hazards and take appropriate precautions; (11) travel in unfamiliar places or use public transportation; and (12) set realistic goals or make plans independently of others.  (*Id*.)  Dr. Tishler explained the basis of his decision as follows:

> [Claimant] can complete simple one to two step tasks.
>
> ***
>
> [Claimant] can complete tasks that do not involve extended periods of attention, concentration or more than daily planning.
>
> ***
>
> [Claimant] should not be required to influence others to follow instructions, demands or handle criticism.
>
> ***
>
> [Claimant] can complete tasks where there is no more than occasional change, and when change occurs it can be explained in simple terms.

11

(*Id.*)

On August 5, 2014, state agency physician Kristen Haskins, Psy.D., reviewed Swain's medical records and completed a PRT and Mental RFC Assessment.  (Tr. 97-98, 101-103.)  She affirmed Dr. Tishler's assessments.  (*Id.*)

### 2. Physical Impairments

On January 13, 2014, state agency physician Gary Hinzman, M.D., reviewed Swain's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 84-86.)  Dr. Hinzman determined Swain could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for 6 hours in an 8-hour workday.  (Tr. 84.)  He found Swain could never climb ladders, ropes, or scaffolds and frequently stoop, kneel, crouch, and crawl.  (Tr. 84-85.)  Dr. Hinzman concluded Swain should avoid concentrated exposure to hazards and not work near unprotected heights.  (Tr. 85-86.)

On July 28, 2014, state agency physician Diane Manos, M.D. reviewed Swain's medical records and completed a Physical RFC Assessment.  (Tr. 99-101.)  She adopted Dr. Hinzman's opinion.  (*Id.*)

### D. Hearing Testimony

During the June 24, 2016 hearing, Swain testified to the following:

- She lives alone in an apartment with her service dog.  (Tr. 52.)  Her drivers' license expired.  (Tr. 53.)  She does not drive because is easily lost.  (*Id.*)

- She reached the 10th grade in school.  (*Id.*)  She has not obtained a GED.  (*Id.*)  She last worked in 2015 as a dog groomer.  (Tr. 54.)

- She cannot work because gets lost and disoriented.  (Tr. 61.)  She relies on her dog to lead her home.  (*Id.*)  She is often dizzy and will fall.  (*Id.*)  She falls 3-4

12

times a week. (Tr. 66.) She staggers when she walks. (Tr. 61.)

•   She has limited access to healthcare and does not want to be on prescription medications. (Tr. 62.) She had an aneurysm in the past, for which she underwent surgery in 1994. (Tr. 63, 67.) Since this operation, she does not "function very well," and believes her dizziness and falls are attributed to the surgery. (Tr. 63-64.)

•   She has pain in her hips and head. (Tr. 64.) She has hearing loss, but her insurance does not cover hearing aids. (Tr. 65.)

•   She takes Celexa for depression. (*Id.*) She does not receive any counseling for depression, but she attends church. (*Id.*) She does not believe her depression would prevent her from working. (*Id.*)

The VE testified Swain had past work as a stock clerk, cleaner, cashier, assembler, and inspector. (Tr. 70-71.) The ALJ then posed the following hypothetical question:

> I'd like you to consider a hypothetical individual who could perform a range of light work[4] as that's defined in our regulations. This individual may occasionally stoop, kneel, crouch, crawl, and balance. Cannot climb ladders, ropes, or scaffolds or work around unprotected heights. Can this individual do any of the past work?

(Tr.72-73.)

The VE testified the hypothetical individual would be able to perform Swain's past work as cleaner, cashier, and inspector. (Tr. 73.) The VE further explained the hypothetical individual

---

[4]     "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

13

would also be able to perform other light, unskilled, representative jobs in the economy, such as a hand packager (D.O.T. #920.687-082), a packing and building machine vendor (D.O.T. #920.665-010), and a mail clerk (D.O.T. #209.687-026).  (*Id.*)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order

to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Swain was insured on her alleged disability onset date, December 31, 2008, and remained insured through December 31, 2016, her date last insured ("DLI.")  (Tr.21, 23.) Therefore, in order to be entitled to POD and DIB, Swain must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.   The claimant engaged in substantial gainful activity in 2012 (20 CFR

15

404.1571 *et seq.*, and 416.971 *et seq.*).  However, there are other periods since her alleged onset date during which she did not engage in substantial gainful activity and, therefore, this opinion addresses those periods.

3.    The claimant has the following severe impairments: obesity, hypertension, ischemic heart disease, and degenerative joint disease of the hips and left knee (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can occasionally stoop, kneel, crouch, crawl, and balance.  She cannot climb ladders, ropes, or scaffolds, or be exposed to unprotected heights.

6.    The claimant is capable of performing past relevant work as a cleaner, cashier, and inspector as actually and generally performed, and the job of assembler as actually performed.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has been under a disability, as defined in the Social Security Act, from December 31, 2008, through the date of the decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 23-40.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been

16

defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.      Opinion Evidence[5]

Swain argues the ALJ failed to properly evaluate the opinion evidence contained in the record.  (Doc. No. 13 at 9.)  Specifically, she asserts "four doctors and a counselor have all authored valid opinions supportive of a finding of mental health severity and mental health related RFC limitations," thus, the ALJ's conclusion Swain has no severe mental impairment is

---

[5]      While Swain seems to assert one assignment of error, a more careful review of her Brief indicates she is raising two arguments: the ALJ erred in her assessment of the opinion evidence and the ALJ erred in her determination Swain's mental impairments are non-severe.  (*See* Doc. No. 13.)  Thus, as these are separate arguments with different sets of controlling law, the Court will consider each in turn.

not supported by substantial evidence.  (*Id*.)

The Commissioner maintains the ALJ properly considered the medical opinions in the record.  (Doc. No. 14 at 19.)  The Commissioner contends "none of these sources are treating physicians, and therefore, none of their opinions are entitled to controlling weight."  (*Id*. at 19, 20.)  She asserts "the fact that Plaintiff does not agree with the ALJ's determination does not mean it is unsupported by the record."  (*Id.* at 20.)

### *1. Consultative Examiner Dr. Pawloski*

Swain first argues the ALJ misinterpreted Dr. Pawloski's opinion when finding it "only supported mild mental health limitation, rather than the moderate limitation that Dr. Pawloski's diagnosis and GAF score indicate."  (Doc No. 13 at 10.)  Swain contends while "it is true that a number of functional areas Dr. Pawloski assessed lead her to find mild impairment . . . [Dr. Pawloski] also found Ms. Swain was likely to cause conflicts with others and would have significant impairment of persistence and pace given her low frustration tolerance."  (*Id*. at 11.)

The Commissioner maintains Dr. Pawloski's opinion was properly weighed and considered.  (Doc. No. 14 at 20.)  The Commissioner asserts "[g]iven the ALJ's lengthy and detailed analysis of Dr. Pawloski's assessment, plaintiff's argument is mere speculation and unsupported by the record."  (*Id.*)  She notes the "ALJ specifically noted that Dr. Pawloski commented on plaintiff's low frustration tolerance, but found no evidence of deficits in attention or concentration, and although Dr. Pawloski commented on plaintiff's unpleasant presentation, she opined that plaintiff appeared to be capable of interacting appropriately."  (*Id.*)

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 C.F.R.

§ 404.1527(e)(2)(i).[6]  Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions.  *Id*.  When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight.  *Id.*

However, the Sixth Circuit has held the failure to assign weight to the opinion of a consultative, non-treating source may not constitute reversible error if the ALJ decision is otherwise supported by substantial evidence.  *See Dykes ex. rel. Brymer v. Barnhart,* 112 F. App'x 463, 468 (6th Cir. 2004) ("if the refusal to even acknowledge the opinion of a treating physician was harmless error in *Heston*, then the ALJ's failure in the present case to discuss thoroughly the opinion of a consultative examiner does not warrant reversal."); *Salter v. Comm'r of Soc. Sec.,* 2015 WL 1880393 at *8 (N.D. Ohio Apr. 24, 2015); *Peshe v. Comm'r of Soc. Sec.,* 2015 WL 6437216 at *12 (N.D. Ohio Oct. 22, 2015).  *See also Pasco v. Comm'r of Soc. Sec.,* 137 Fed. App'x 828, 839 (6th Cir. 2005) (finding an ALJ did not err in failing to discuss a

---

[6]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

consultative examiner report, when the claimant did not explain how the report would support

her disability claim.)

Here, the ALJ thoroughly recounted the medical evidence regarding Swain's mental

impairments. (Tr. 25-29.) Within this discussion of the medical evidence, the ALJ provided the

following analysis of Dr. Pawloski's January 2014 consultative examination:

> The claimant was psychologically evaluated in in[sic] January 2014, in
> connection with her application for disability benefits. The claimant said
> that she was unable to work because of her "thought processes, memory,
> and strength . . . a history of falling" (Exhibit 4F/2). She said she had
> previously received disability after her brain surgery, which ceased when
> she remarried, and was now applying for disability benefits again. She said
> there was abuse in her marriage and she divorced in 2008. She was
> homeless for a while, but now lived with two roommates in a house. She
> spoke a little to her three adult children because of conflict over finances.
> She left school in the 10th grade after she resisted the assistant principal's
> sexual advances and he conspired to have her removed from class. She said
> she got straight A's in school until high school. She had difficulties with
> attendance during high school because of drug abuse. She attended GED
> classes and was ready to take the test, but her first husband put her in the
> hospital, so she was unable to do so. The claimant said that since her brain
> surgery she had shaking, balance problems, and memory difficulties. She
> said she was unable to look up or reach above her head. She had
> misdemeanor legal charges as a juvenile, primarily from theft, but no
> charges as an adult. She said she abused drugs for 10 years, from age 12.
> She worked at Walmart for a year and a half until July 2013, when she was
> fired for promoting her dog grooming business, although she denied that
> allegation. She was fired on another occasion from a waitressing job for
> stealing money and "calling out the manager" (*Id*., at 3). The claimant said
> she'd been diagnosed with severe depression at Community Mental Health.
> She said she had been stressed since September 2013 when she lost her job,
> her house, and a "service dog" that she had trained (*Id*., at 3-4).
>
> On an average day, the claimant reported that she took her roommate's dog
> out, drank coffee, and read most of the day. She reported that she did
> dishes, swept, mopped, and did laundry. She relied on friends for
> transportation, and walked. The claimant was casually dressed with
> appropriate hygiene. Her attitude was "very tense and hurt" (*Id*., at 4). She
> had no deficits in recent, remote, or immediate memory. She appeared to
> have average intellectual functioning. Brithany Pawlowski, PsyD,,

21

diagnosed the claimant with moderate single episode major depressive disorder, and assigned a global assessment of functioning score of 58, at the upper end of moderate functioning.  She opined the claimant might have difficulties with arithmetic, but in general did not have any major deficits in understanding, remembering, or carrying out instructions.  She indicated that the claimant had had[sic] a low frustration tolerance that was expected to affect her persistence and pace significantly, although there was no evidence of deficits in attention or concentration.  She had a fairly bland and curt presentation and was "not the most pleasant person" at her evaluation, but appeared to be able to interact appropriately.  Dr. Pawlowski did not anticipate that work exposure would cause her any deterioration in mental health, as the claimant appeared motivated not to feel "lazy" (*Id*., at 6).  Dr. Pawlowski's opinion is the result of her own observations, a clinical interview, review of collateral information, and a mental status evaluation.  Further, as a consultant for the Social Security Administration, she has knowledge of Social Security Administration's program and requirements.  I give significant weight to the functional assessment, but less weight to her finding that the claimant's depression is moderate, and assignment of a moderate GAF rating, as the functional assessments themselves do not support more than mild limitations.  Dr. Pawlowski's statements that should the claimant did not have any major deficits in understanding remembering, and completing tasks, did not have any significant deficits in attention and concentration, appeared able to interact, and was not expected to deteriorate in response to work pressure support mild rather than moderate limitations.

(Tr. 26-27.)

The Court finds the ALJ properly evaluated Dr. Pawloski's opinion.  The ALJ discussed the examination findings and expressly acknowledged the opinion.  (Tr. 26-27.)  The ALJ ascribed "significant weight" to part of the opinion, and provided several reasons for doing so.  (*Id*.)  Specifically, the ALJ noted the opinion was based upon Dr. Pawloski's own observations, a clinical interview, and a review of collateral information.  (Tr. 26.)  She further acknowledged Dr. Pawloski's status as consultative examiner and her familiarity with the Social Security disability program.  (*Id*.)  These reasons are all factors which an ALJ must consider when weighing medical opinions.  *See* 20 C.F.R. § 404.1527(c).

22

The ALJ also afforded "less weight" to Dr. Pawloski's findings that Swain had moderate depression and a moderate GAF score rating.  (Tr. 27.)  She noted these moderate findings were inconsistent with Dr. Pawloski's functional assessments, which did "not support more than mild limitations."  (*Id.*)  The ALJ went on to specifically note these mild limitations, including Dr. Pawloski's findings Swain "did not have any major deficits in understanding remembering, and completing tasks, did not have any significant deficits in attention and concentration, appeared able to interact, and was not expected to deteriorate in response to work pressure."  (*Id.*)  The ALJ's discussion of this internal inconsistency within Dr. Pawloski's opinion is a perfectly reasonable explanation for disregarding portions of the opinion and ascribing them "little weight."

These reasons are supported by substantial evidence.  The record indicates Swain was briefly hospitalized after she had attempted to overdose on her medications in January 2014, five years after her alleged onset date.  (Tr. 309.)  Upon discharge, Swain proceeded to attend counseling a total of four times between January 2014 and May 2014.  (Tr. 490, 492, 494, 496.)  On May 16, 2014, at her last documented counseling session, she indicated her life was almost "back to normal" and her condition was improved.  (Tr. 490.)  For the remainder of the relevant period, Swain's only mental health treatment was an antidepressant from her primary care doctor, Dr. Piancentini.  (Tr. 556, 560, 563.)  Moreover, neuropsychological testing in July 2016 yielded "uniformly normal" results.  (Tr. 658.)  Finally, at the hearing, Swain testified she did not believe her depression prevented her from working.  (Tr. 65.)

Swain argues the ALJ mischaracterized segments of Dr. Pawloski's opinion as mild, when they were moderate in nature.  Specifically, Swain notes the parts of Dr. Pawloski's

analysis which describe Swain as "a very on edge person and it is likely that that may cause

conflicts with others" and the finding Swain "tended to have low frustration tolerance for tasks

[which appeared] to be her biggest barrier and will impact her persistence and pace fairly

significantly related to her mood."  (Doc. No. 13 at 11, Tr. 471, 472.)  However, with regards to

the commentary on Swain's "on edge" personality, Swain fails to mention that Dr. Pawloski, in

the functional assessment portion of her report, specifically noted while Swain was "not the most

pleasant person, [] she appears to be able to interact within appropriate means."  (Tr. 472.)  Thus,

the ALJ's characterization of this portion of the opinion as "mild" is accurate and supported by

the evidence.

Dr. Pawloski did opine that Swain had a low frustration tolerance, which would impact

her persistence and pace.  (Tr. 472.)  However, the ALJ specifically noted this in her discussion

of the consultative examination.  (Tr. 26.)  Despite Swain's assertions to the contrary, the ALJ

clearly considered this portion of Dr. Pawloski's opinion in her evaluation of the evidence.  The

ALJ did not mischaracterize Dr. Pawloski's conclusions regarding persistence and pace, because

she did not include it in her list of areas Dr. Pawloski found mild limitation.  Moreover, the ALJ

did not adopt the opinion as a whole.  Rather, she ascribed portions of it significant weight, as the

majority of the limitations found by Dr. Pawloski were mild in nature.  The Court notes Swain

herself acknowledges "it is true that a number of the functional areas Dr. Pawloski assessed lead

her to find mild impairment."  (Doc. No. 13 at 11.)

Even assuming, *arguendo*, the ALJ's findings deviate in some respect from Dr.

Pawloski's opinion, this alone is not grounds for reversal.  *See Dykes ex rel. Brymer v. Barnhart*,

112 Fed. App'x 463, 468 (6th Cir. 2004) ("the ALJ's failure in the present case to explain why he

24

disregarded part of the opinion of the consultative examiner does not warrant remand.").

In sum, the ALJ expressly acknowledged Dr. Pawloski's opinion and provided several reasons for the weight she provided this opinion. Procedurally, the regulations require no more for a non-treating, examining physician.

Accordingly, the Court finds the ALJ did not err in her assessment of Dr. Pawloski's opinion.

### 2. Counselor Brown

Swain next argues the ALJ failed to properly consider Mr. Brown's opinion and diagnoses. (Doc. No. 13 at 12.) She asserts each of the reasons the ALJ provided for discounting Mr. Brown's opinion is "flawed." (*Id.*) She contends several of the other opinions in the record "are consistent with the findings in Counselor Brown's report, at least to the extent they support a finding of severity of the mental health impairment." (*Id.* at 12, 13.)

The Commissioner maintains the ALJ properly considered Mr. Brown's opinion. (Doc. No. 14 at 21.) She asserts the "ALJ explicitly recognized SSR 06-03p, observed that Mr. Brown's opinion was not a medical opinion, let alone a treating physician opinion entitled to controlling weight, and considered the opinion accordingly." (*Id.*) The Commissioner contends "given the absence of objective findings, the ALJ reasonably inferred that Mr. Brown's diagnoses were based largely on plaintiff's subjective representations." (*Id.* at 22.)

Under Social Security Regulations, a counselor is not an "acceptable medical source" entitled to the type of "controlling weight" an "acceptable medical source" enjoys. *See* 20 C.F.R §§ 416.902(a)(1) - (8), 416.927(a)(1), 416.927(f). However, the regulations also provide these opinions still must be considered, using the same factors listed in 20 C.F.R. §416.927(c). The

regulations further provide "not every factor for weighing opinion evidence will apply in every case" and the "adjudicator generally should explain the weight given to opinions from these source or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning."  20 C.F.R. §416.927(f)(1)-(2).

Social Security Ruling 06-03[7] further explains how opinion evidence from "other sources" should be treated.  SSR 06-03p provides information from "other sources" (such as a chiropractor) is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 2006 WL 2329939 at *2-3 (August 9, 2006).  Interpreting this SSR, the Sixth Circuit has found opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion."  *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06-03p, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion").  *See also Williams v. Colvin,* 2017 WL 1074389 at *3 (N.D. Ohio March 22, 2017).

Here, the ALJ discussed Mr. Brown's diagnostic assessment as follows:

The claimant received multiple mental health diagnoses from a counselor who is not considered an acceptable medical source (Exhibit 6F/7).

---

[7]     The Court notes SSR 06-03p was rescinded on March 27, 2017.  This rescission is effective for claims filed on or after March 27, 2017.  SSR 96-2p, 2017 WL 3928298 at *1.

\*\*\*

The claimant received a diagnostic assessment by a counselor in January 2014, following her suicide attempt.  The claimant said her strengths were that she was intelligent and cared about animals, but noted that she had a brain injury that caused her ongoing problems.  She had one best friend that she lived with.  She gave a history of sexual and physical abuse but denied flashbacks, though she did report nightmares.  She was prescribed Celexa, which she said was not helping her depression.  She said she had stress headaches.  The claimant said she had no illegal behaviors for 30 years since she stopped abusing drugs and alcohol.  She reported no psychotic symptoms.  The claimant said she had filed for Social Security disability benefits.  The claimant said she worked for Walmart for a year and a half and was fired due to poor performance.  The claimant reported that she received unemployment benefits of $100 a week.  The mental status exam sheet showed the claimant to be well groomed and overweight, with average demeanor, eye contact, activity, and speech.  Her thought processes were logical, and she was cooperative, with a full affect.  She appeared to be of average intelligence but was limited in attention and concentration.  The counselor diagnosed major depressive disorder, polysubstance dependance, personality disorder, and cognitive problems, and assessed a GAF of 54, indicating moderate symptoms (Exhibit 6F/1-10).  Later that month, the claimant reported no changes.  She said she was having ongoing problems with her oldest daughter who posted nasty things about her on Facebook and refused to give her dog back (*Id*., at 17).  These opinions and diagnoses of the counselor been considered, even though these opinions are not entitled to controlling weight under Social Security Ruling 06-3p, nor are they treated as "medical opinions."  Nevertheless, I reject these opinions because they are not supported by a review of the longitudinal record, including an analysis of the Listing 12.04B and C criteria and appear to rely too heavily on the claimant'[sic] subjective complaints, which are not found to be fully credible.  The counselor also [diagnosed] polysubstance dependance despite 30 years' remission.

(Tr. 25, 27.)

The Court finds the ALJ properly evaluated Mr. Brown's opinion.  The ALJ expressly acknowledged Mr. Brown's diagnoses and moderate GAF score, and rejected them based on the following: (1) Mr. Brown is a counselor, not an acceptable medical source,; (2) his conclusions were inconsistent with the record; and (3) his conclusions relied on the subjective reports of

27

Swain. (Tr. 25, 27.) The ALJ then went on to discuss Swain's mental health treatment record, noting Swain did not return to Mr. Brown until April 2014, and discontinued counseling all together in May 2014. (Tr. 27.) As noted *supra*, the ALJ is charged with generally explaining the weight given to opinions from other sources, or "otherwise ensur[ing] that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicators's reasoning." 20 C.F.R. §416.927(f)(1)-(2). The ALJ's discussion of the opinion complies with this regulation, as well as the factors set forth in SSR 06-03p.

Further, the ALJ's evaluation of Mr. Brown's conclusions are supported by substantial evidence. The record reflects Swain presented for mental health treatment only a handful of times between her December 2008 alleged onset date and the ALJ's September 2016 decision. With regard to Mr. Brown specifically, Swain attended counseling with him a total of four times between January 2014 and May 2014. (Tr. 490, 492, 494, 496.) On May 16, 2014, her last documented visit with Mr. Brown, she indicated her life was "almost back to normal" and her condition was improved. (Tr. 490.) For the remainder of the relevant period, Swain's only mental health treatment was an antidepressant from her primary care doctor, Dr. Piancentini. (Tr. 556, 560, 563.)

Swain asserts the "ALJ offers no support for [the] conclusion" Mr. Brown relied heavily on her subjective reports. However, the ALJ described, in detail, the objective findings made by Mr. Brown, including a relatively normal mental status examination. (Tr. 27.) The ALJ contrasted these findings with the GAF score and diagnoses, and reasonably concluded Mr. Brown's opinion "appear[ed] to relay too heavily" on Swain's subjective complaints. (*Id*.)

Swain also argues Mr. Brown's conclusions are "supported by the longitudinal record,"

28

citing the other opinion evidence in the record.  (Doc. No. 13 at 12.)  However, as the ALJ

correctly noted, Swain's mental health treatment was minimal, with her counseling spanning 5

months in total.  (Tr. 27.)  Although Swain cites evidence from the record she believes supports a

finding of severe mental impairments, the findings of the ALJ "are not subject to reversal merely

because there exists in the record substantial evidence to support a different conclusion."  *Buxton*

*v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear an

ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so

long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r*

*of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003).  In this matter, the ALJ clearly articulated her

reasons for discounting Mr. Brown's conclusions and these reasons are supported by substantial

evidence.

    In sum, because Mr. Brown is an "other source," the ALJ was not required to accord

any particular weight to his opinion nor was she required to provide "good reasons" for rejecting

it.  Rather, the ALJ was required only to evaluate Mr. Brown's opinion using the applicable

factors set forth in the regulations.  *See Cruse*, 502 F.3d at 541.  The Court finds the ALJ

properly evaluated and discounted Mr. Brown's opinion for the reasons set forth above.

### c.  Examining physician J.R. Clark, Jr., Psy.D.

    Swain argues the ALJ failed to properly consider the diagnoses and opinion of

examining physician Dr. Clark.  (Doc. No. 13 at 14.)  Swain acknowledges the "treating

physician rule" does not apply, but "other than that it has no bearing on the degree to which his

opinion is to be evaluated in regards to the severity or RFC analysis."  (*Id*. at 16.)

    The Commissioner maintains the ALJ properly considered Dr. Clark's opinion and

29

diagnoses.  (Doc. No. 14 at 23.)  She notes Dr. Clark's "conclusion of disability is not a medical opinion, and is entitled to no weight as such."  (*Id.*)  The Commissioner asserts "the fact that the plaintiff sought virtually no mental health treatment after her last visit with Mr. Brown in May 2014, coupled with representation at the hearing that her depression would not render her unable to work, suggests that her symptoms are not as severe as she represented them to be during her single encounter with Dr. Clark."  (*Id*. at 24.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id.*  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), id. § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), id. § 404.1502, 404.1527(c)(2)."  *Id.*  Notably, the procedural "good reasons" requirement does not apply to non-treating physicians. *Smith*, 482 F.3d at 876 (explaining that "[i]mportantly ... this reasons giving requirement exists only for § 404.1527(d)(2), and not for the remainder of § 404.1527" and concluding: "[i]n the absence of treating-source status for these doctors, we do not reach the question of whether the ALJ violated Wilson by failing to give reasons for not accepting their reports").

30

The ALJ analyzed the neuropsychological evaluation with Dr. Clark as follows:

The claimant obtained a neuropsychological evaluation in July 2016, following her disability hearing (Exhibit 18F).  The claimant recounted her history of aneurysm clipping 19 years earlier, and said that she was now experiencing two migraine headaches per week, of moderate severity.  She treated her headaches by taking extra strength Tylenol and going to bed for a day or two.  She said she suffered from low back pain with right sciatic involvement and bilateral knee arthritis.  The claimant said she was unsteady on her feet and staggered like she was drunk.  She said she was dizzy 90% of the time.  She reported falling three times in the past month, and had used a service dog for three years, who helped her with ambulation and getting up if she falls.  She said her hearing was declining constantly but had been told she was not at the point where she needed hearing aids. She also reported that her hands became numb a lot and she had lost her sense of smell following her brain surgery.  She reported poor short-term memory and said she had developed problems with geographical awareness such that she would get lost in her own neighborhood.  She did not receive SSI benefits despite having applied several times, but did receive food stamps and $67 a month in cash.  She denied hallucinations and flashbacks but said she did have nightmares about childhood abuse by a neighbor, and woke up 5 to 6 times a night, getting only two hours of sleep per night because of nightmares.  The claimant reported extensive abuse of alcohol and street drugs, including intravenous drugs, from ages 12 through 30.  She said she'd never been psychiatrically hospitalized.  She was married five times, most recently from 2003 to 2007.  She had three children, one of whom she had no contact with.  She reported multiple concussions in the course of her life that included loss of consciousness.  The claimant presented as an alert and fully oriented middle-aged woman.  Her service dog was with her, and she ambulated with his assistance.  Her grooming and hygiene were good.  Her affect was flattened and she appeared mildly to moderately depressed.  There was no evidence of overt psychosis or mania. Neuropsychological test findings indicated low average verbal attention span, average verbal working memory, high average visual working memory, normal language skills, intact spatial reasoning ability, average fine motor speed, high average object naming, average processing speed, high average target detection accuracy, average speed of word retrieval, and average short and long delay recall.  Her immediate and delayed verbal memory for storing material was average and verbal recognition memory for storing material was low average.  On measurements assessing cognitive executive problem-solving, her performance was normal.  James Clark, PsyD, concluded that the claimant's neuropsychiatric testing was uniformly normal and she had no neurocognitive deficits.  Despite this, he diagnosed

31

the claimant with Recurrent Moderate Major Depressive Disorder, Chronic Posttraumatic Stress Disorder, and Substance Use Disorder in Sustained Full Remission, with Rule out Diagnosis of Unspecified Sleep-Wake Disorder and Unspecified Somatic Symptoms and Related Disorder. The latter diagnosis suggests a possible non-organic causes for some of the claimant's reported symptoms. Dr. Clark indicated that he supports SSI benefits because of depression, profound sleep limitations, and PTSD, based on her self-report and subjective personal inventory tools, but he does not describe any limits on concentration, social interaction, or handling stress. He said he found her to be highly intelligent, which suggests no limits in understanding, repeating, and carrying out instructions. Considered in the context of the claimant's full activities of daily living, living independently, working part time, dog grooming, and limited mental health complaints or treatment in the longitudinal file, the record as a whole supports a finding that the claimant's mental impairments are non severe. The opinion of the consultative evaluator is not accepted insofar as it suggests that the claimant has an inability to tolerate the stress of all work. Such a conclusion is not supported by the greater weight of the evidence of record and appears to be based primarily on the claimant's subjective presentation and complaints, which are not wholly consistent with other evidence of record, as discussed throughout this decision. His conclusion of disability addresses an area that is specifically reserved for the Commissioner under Social Security Ruling 96-5p. Dr. Clark does not have a treating relationship with the claimant, but evaluated her on a single occasion immediately after her disability hearing, suggesting that her presentation on that day may have been colored by an attempt to bolster her SSI application. While the generally unremarkable results of the objective testing are given significant weight, Dr. Clark's conclusion of disability is rejected, as is his opinion of severe psychological difficulties and compromise in day-to-day functioning, which are unsupported by objective evidence and appear to rely only on the claimant's subjective report. Based on the objective evidence identified in this evaluation, I do not find support for severe mental impairments.

(Tr. 28-29.)

The Court finds the ALJ properly considered Dr. Clark's opinion. As an initial matter, Dr. Clark's conclusion Swain was not "capable engaging in full-time gainful employment at this time," offered no specific functional limitations. (Tr. 659.) Thus, this conclusion is not an opinion of a medical condition. *See Morr v. Colvin,* 2015 WL 350384 at *5 (N.D. Ohio Jan. 26,

32

2015). Rather, as correctly noted by the ALJ, it was an opinion on an issue reserved for the

Commissioner, and entitled to no special significance or deference. *See Turner,* 381 Fed. App'x

at 493 and *Curler,* 561 Fed. App'x at 471. An ALJ is not required to defer to a doctor's

statement regarding disability. *Morr,* 2015 WL 350384 at *5.

As for Dr. Clark's diagnoses and characterization of Swain's depression as "moderate,"

the ALJ properly evaluated these opinions. The ALJ acknowledged Dr. Clark's conclusions and

provided several reasons for rejecting them. (Tr. 29.) Specifically, the ALJ found Dr. Clark's

opinions were "unsupported by objective evidence and appear to rely only on the claimant's

subjective report." (*Id.*) The ALJ also acknowledged Dr. Clark's status as a one-time examining

physician. (*Id.*)

These reasons are supported by substantial evidence. As noted *supra*, Swain's mental

health treatment has been minimal. During the relevant period, she attended counseling a total of

four times. (Tr. 490, 492, 494, 496.) While her primary care doctor regularly prescribed her an

antidepressant, he also repeatedly noted Swain had good insight and judgment, a normal mood

and affect, and no apparent "psychological or social disorders." (Tr. 563, 560, 561, 558, 557,

555.) Dr. Clark's neuropsychological testing was "uniformly normal." (Tr. 658.)

It is true Swain completed a Beck Depression Inventory II during the Dr. Clark's

evaluation, and her score was within the severe range of depression. (Tr. 657.) However, the

Beck Depression Inventory is "a 21-item, self report rating inventory," and thus, is based upon

Swain's subjective report. *See Brown v. Comm'r of Soc. Sec.*, 2015 WL 4430395 *3, n. 8 (N.D.

Ohio July 20, 2015). The ALJ's conclusion Dr. Clark's opinion was based upon Swain's

subjective report is therefore a reasonable one, given the "uniformly normal" neuropsychological

testing and a depression score based upon Swain's self report. (Tr. 657, 658.) The Court notes the ALJ did suggest Swain may have attempted "to bolster her SSI application" during her evaluation with Dr. Clark, as the evaluation occurred after her administrative hearing. While this reasoning lacks clarity, the ALJ provided several other valid reasons for rejecting Dr. Clark's opinion, and thus, fully complied with the procedural requirements set forth by the regulations as it pertains to non-treating, examining physicians.

Accordingly, the Court finds the ALJ did not err in the weighing of Dr. Clark's opinion.

### d. State Agency Physicians – Drs. Tishler & Haskins

Finally, Swain asserts the ALJ improperly disregarded the state agency physicians' conclusion that Swain has a severe mental impairment. (Doc. No. 13 at 17.) She argues the ALJ's reasoning was flawed, as it was based upon a misinterpretation of Dr. Pawloski's opinion and not supported by substantial evidence. (*Id*. at 18.)

The Commissioner maintains the "ALJ reasonably explained the weight accorded these opinions, and that assessment should be upheld." (Doc. No. 14 at 25.)

An ALJ must weigh the opinions of agency reviewing physicians under the same factors as treating physicians including weighing the supportability and consistency of the opinions, as well as the specialization of the physician. *See* 20 C.F.R. § 416.972(d), (f). However, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2) (I). Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions. *Id*.

34

The ALJ, in addressing the opinions of the non-examining state agency physicians,

found as follows:

> The State agency opinions regarding the claimant's psychological
> impairments, identifying moderate limitations in maintaining social
> functioning and concentration, persistence, or pace are given little weight
> (Exhibit 1A and 3A), because the consulting psychological evaluator's
> opinion at Exhibit 4F is more consistent with the record as a whole.
> Evidence of the claimant's activities of daily living received at the hearing
> level shows that the claimant is not as limited as determined by State
> agency consultants.
>
> ***
>
> I also give little weight to the Bureau of Disability Determination
> psychological experts because, as discussed in detail above, I find the
> consultative examiner's actual observations do not support more than mild
> functional limitations, and similarly the few treating notes we have also
> indicate 'minimal' depressive symptoms (Exhibit 6F/11) or 'mild'
> depression (Exhibit 6F/10) with euthymic mood and full affect, except at
> times of transient situational stressors such as her problems with her
> roommates and family (e.g., Exhibit 6F/15, 17).

(Tr. 30, 39.)

The Court finds the ALJ properly considered the opinions of state agency non-

examining physicians, Drs. Tishler and Haskins.  The ALJ expressly acknowledged their

opinions in the decision.  (Tr. 30.)  The ALJ ascribed "little weight" to these opinions, and

provided several reasons for doing so.  (*Id.*)  Specifically, the ALJ noted Dr. Pawloski's opinion

was more consistent with the evidence and the updated evidence of Swain's activities of daily

living indicated she was not as limited as determined by Drs. Tishler and Haskins.  (*Id.*)  The

ALJ also acknowledged Drs. Tishler and Haskins' status as state agency evaluators.  (*Id.*)

These reasons are supported by substantial evidence.  The record indicates Swain's

mental health treatment was conservative in nature.  She was briefly hospitalized in January

2014, and proceeded to attend counseling for a few months following this hospitalization.  (Tr. 309, 490, 492, 494, 496.)  Swain discontinued counseling in May 2014, after reporting to her counselor her life was almost "back to normal" and her condition was improved.  (Tr. 490.)  For the remainder of the relevant period, Swain's only mental health treatment was an antidepressant from her primary care doctor, Dr. Piancentini.  (Tr. 556, 560, 563.)  Further, it is notable that Drs. Haskins and Tishler both provided their opinions in 2014, the only year in which Swain sought treatment from a mental healthcare professional.  As the ALJ correctly noted, evidence received "at the hearing level shows that the claimant is not as limited as determined by the State agency consultants."  (Tr. 30.)

Swain argues the ALJ mischaracterized segments of Dr. Pawloski's opinion, thus, the ALJ's reliance on this opinion to discredit the opinions of Drs. Haskins and Tishler is misplaced. (Doc. No. 13 at 17.)  The Court has addressed the ALJ's treatment of Dr. Pawloski's opinion at length *supra*.  The ALJ's characterization of Dr. Pawloski's opinion was not in error, as the majority of the limitations found by Dr. Pawloski were mild in nature.  Therefore, the ALJ correctly relied on Dr. Pawloski's opinion when disagreeing with the moderate limitations offered by Drs. Tishler and Haskins.

In sum, the ALJ expressly acknowledged the state agency physicians' opinions and provided several reasons for rejecting their conclusions.  Procedurally, the regulations require no more for non-treating, non-examining physicians.

Accordingly, the Court finds the ALJ did not err in her assessment of the opinions of Drs. Haskins and Tishler.

**B.      Step Two Analysis**

36

Swain also argues the ALJ erred in failing to find her mental impairments "severe" at step two of the sequential evaluation.  (Doc. No. 13 at 18.)  She notes two psychologists and two state agency psychological consultants "found limitations consistent with a severe mental health impairment."  (*Id*.)  She contends that since there was no evaluator who found a non-severe mental impairment, "the record clearly supports a finding of severity, and resultant limitations" in the RFC.  (*Id*. at 19.)  Swain maintains this failure to find severe mental impairments is not harmless, because if the RFC included limitations to reflect severe mental impairments, it would "presumably preclude" her ability to perform several of the jobs provided by the VE.  (*Id*.)

The Commissioner asserts the ALJ reasonably determined Swain's mental impairments were not severe.  (Doc. No. 14 at 16-17.)  The Commissioner asserts the "ALJ's assessment is supported by substantial evidence and should be upheld."  (*Id.* at 17.)  She maintains the ALJ's step two finding is supported by the fact Swain (1) has had essentially no mental health treatment during most of her alleged period of disability and (2) "testified that she did not think that her mental impairments would preclude her from working, adding that she could work but for her physical limitations."  (*Id*. at 19.)

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a) (40)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. § 416.920(c).  "An impairment ... is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1)

physical functions such as standing, sitting, lifting, handling, etc.; (2) the ability to see, hear and speak; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and, (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b) & 416.921(b).

   The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181 at *1 (July 2, 1996).  However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id.*  "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." *Id.*

   When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at step two does "not constitute reversible error."  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th

Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at * 2 (6th Cir. 2009).  The
Sixth Circuit has observed that where a claimant clears the hurdle at step two (i.e. an ALJ finds
that a claimant has established at least one severe impairment) and claimant's severe and
non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he
fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally
irrelevant." *Anthony v. Astrue*, 2008 WL 508008 at * 5.

  Here, at step two, the ALJ concluded Swain's obesity, hypertension, ischemic heart
disease, and degenerative joint disease of the hips and left knee constituted "severe"
impairments.  (Tr. 24.)  She found Swain's psychological impairments were not "severe."  (Tr.
29.)  To support this conclusion, the ALJ reviewed the entirety of Swain's mental health
treatment record, noting Swain had a suicide attempt in January 2014 and subsequently began
counseling.  (Tr. 25, 27.)  She focused on the fact Swain did not return to counseling after five
counseling visits from January 2014 through May 2014.  (Tr. 27.)  She also discussed Swain's
consultative examination and neuropsychological evaluation at length.  (Tr. 26, 28.)  After
reviewing all of this evidence, the ALJ concluded as follows:

> The claimant's medically determinable mental impairments of affective
> disorder and anxiety disorder, considered singly and in combination, do not
> cause more than minimal limitation in the claimant's ability to perform
> basic mental work activities are therefore nonsevere.

(Tr. 29.)  The ALJ then considered the four broad functional areas set forth in the disability
regulations for evaluating mental disorders.  (Tr. 29-30.)  She found no more than mild
limitations, as follows:

> The first functional area is activities of daily living.  In this area, the
> claimant has mild limitation.  She told her consultative evaluator that on an
> average day, she rose at 7 o'clock, took her roommate's dog out, drank

39

coffee, read for most of the day, did dishes, swept, mopped, did laundry, and relied on friends for transportation (Exhibit 4F/4).  The claimant has proven adept at navigating the social welfare system in order to obtain public benefits.  She lives independently in senior apartments.  She recently reported that she keeps tarantulas, snakes, turtles, cats, and dogs (Exhibit 19F/4).  She is able to use a Kindle for reading (Exhibit 18F/3), and complained that others were posting nasty things about her on Facebook, which suggests that she has technical skills sufficient to allow her to use social media (Exhibit 6F/17).  As previously noted, she also engaged in significant work activity after her alleged onset date.  The evidence does not show that the claimant has more than mild limitations in performing activities of daily living, due to mental impairment.

The next functional area is social functioning.  In this area, the claimant has mild limitation.  The claimant's psychological evaluator noted that she presented with a fairly bland and curt demeanor and was not the most pleasant person, but appeared to be able to interact within appropriate means.  The claimant stated that she never had a job for more than one or two years because she was too blunt (Exhibit 4F/3, 6).  However, she has been able to hold jobs during the period under consideration, including working for a year and a half at Walmart (*Id*., at 3), suggesting no significant limitations in her ability to go out in public or interact professionally.  Various treatment providers have described her as cooperative (Exhibits 3F/94, 4F/1, 6F/10), and pleasant (Exhibits 10F/5, 7, 9, 12, 14, 16, 13F/2, 6, 15, 17, 24 and 15F/1).  She recently reported that she was attending church (Exhibit 19F/4).  The evidence does not show more than mild limitations in social functioning due to mental impairments.

The third functional area is concentration, persistence or pace.  In this area, the claimant has mild limitation.  In her recent neuropsychiatric evaluation, the claimant was observed to be highly intelligent, and no limitations in concentration were identified.  Although she testified to significant memory and concentration problems, extensive neurological testing identified no objective memory deficits, normal processing speed, and normal cognitive executive problem-solving skills.  The evaluator noted that the claimant's subjective experience of poor short-term memory and geographical disorientation was likely attributable to "non-neurological factors", rather than her history of brain surgery for aneurysm clipping (Exhibit 18F/9).  The claimant is able to perform activities of daily living as described above including living independently, managing her own finances, using the Internet, and reading for pleasure.  She reported high levels of life stress due to her inability to work and lack of income, suggesting that employment would reduce rather than aggravate stress-related symptoms (*Id*., at 3).  Her psychological evaluator noted that the claimant did not

40

report any emotional or mental deterioration in response to work exposure, but stated that she was always looking for work because she was not lazy. This suggests that the claimant believed herself able to work. He did observe that the claimant did have a low frustration tolerance for tasks, which he believed would affect her persistence and pace fairly significantly related to her mood (Exhibit 4F/3, 6). The objective evidence of record does not support a finding or more than mild limitations in maintaining concentration, persistence, and pace for work-related activities.

The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation which have been of extended duration.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1).

(*Id.*)

The Court finds substantial evidence supports the ALJ's conclusion Swain's mental impairments are non-severe. The record reflects Swain presented for mental health treatment only a handful of times between her December 2008 alleged onset date and the ALJ's September 2016 decision. In fact, the first evidence of any mental health treatment was in January 2014, five years after her alleged onset date. In January 2014, Swain was briefly hospitalized after she had attempted to overdose on her medications. (Tr. 309.) She was discharged after one day, and upon discharge, had a logical, clear thought process and was denying suicidal ideation. (Tr. 313, 401.) Swain proceeded to attend counseling with Mr. Brown a total of four times between January 2014 and May 2014. (Tr. 490, 492, 494, 496.) On May 16, 2014, her last documented visit with Mr. Brown, she indicated her life was almost "back to normal" and her condition was improved. (Tr. 490.)

For the remainder of the relevant period, Swain's sole mental health treatment was an

41

antidepressant prescribed by Dr. Piancentini.  (Tr. 556, 560, 563.)  Within Dr. Piancentini's

treatment notes, the doctor repeatedly noted Swain had good insight and judgement, a normal

mood and affect, and no apparent "psychological or social disorders."  (Tr. 563, 560, 561, 558,

557, 555.)  As noted *supra,* Swain underwent a neuropsychological evaluation with Dr. Clark in

July 2016 and her "neuropsychological testing [was] nearly uniformly normal."  (Tr. 658.)

Moreover, at the hearing, Swain testified she did not believe her depression prevented her from

working.  (Tr. 65.)

   Swain also reported an ability to conduct a wide variety of daily activities, including

significant work activity since her December 2008 alleged onset date.  She was able to work at a

level of substantial gainful activity in 2012 and 2013, and periodically worked in 2009 and 2015.

(Tr. 24.)  At her January 2014 consultative examination, Swain indicated she was able to perform

household chores, read for pleasure, and care for animals.  (Tr. 470.)  As noted by the ALJ,

Swain is able to live independently in an apartment, use the internet, and attend church.  (Tr. 29,

30.)

   Swain argues since two examining psychologists and two state agency psychological

consultants "found limitations consistent with a severe mental health impairment," the ALJ erred

in her conclusion that Swain's mental impairments are non-severe.  (Doc. No. 13 at 18.)

However, as discussed *supra*, the ALJ properly weighed and discounted these opinions.  While

the social security regulations mandate an ALJ must consider each opinion contained in the

record, they do not provide that an ALJ must subscribe to at least one of the opinions contained

in the record.  *See* 20 C.F.R. §416.927(c).  The regulations provide "although we consider

opinions from medical sources . . . the final responsibility for deciding these issues is reserved to

the Commissioner."  20 C.F.R. §416.927(d)(2).

Accordingly, and based upon the totality of the evidence discussed above, the Court finds substantial evidence supports the ALJ's step two determination Swain's mental impairments were "non-severe."[8]  Thus, Swain's assignment of error is without merit.

### VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends the Commissioner's final decision be AFFIRMED.

s/Jonathan D. Greenberg
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 2, 2018

---

[8]     The Court notes that, even if the ALJ did err in finding Swain's mental impairments non-severe at step two, the ALJ's consideration of the cumulative effect of Swain's impairments (both severe and non-severe) throughout the remaining steps of the analysis rendered any such error harmless.  *Maziarz,* 837 F.2d at 244.  The record reflects at step four of the decision, the ALJ indicated she had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  (Tr. 33.)  The ALJ then acknowledged Swain's testimony regarding her memory loss, anxiety, and diminished attention span.  (*Id.*)  The ALJ also noted Swain testimony that she did not currently receive mental health treatment and did not think her depression prevented her from working.  (Tr. 34.)  At this step, the ALJ again noted she was assigning little weight to the state agency physicians, nothing the consultative examiner findings and "the few treating notes we have also indicate 'minimal' depressive symptoms (Exhibit 6F/11) or 'mild' depression (Exhibit 6F/10) with euthymic mood and full affect, except at times of transient situational stressors such as her problems with her roommates and family (e.g., Exhibit 6F/15, 17)."  (Tr. 39.)  Thus, as the ALJ considered Swain's mental allegations and impairments throughout the remaining steps of her disability analysis, there is no reversible error.  *See Steslicki v. Comm'r of Social Security,* 2014 WL 12576640 at *2 (E.D. Mich Mar. 24, 2014).

## OBJECTIONS

   Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).